Electronically Filed
Intermediate Court of Appeals
CAOT-20-0000528
03-SEP-2020
12:17 PM

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAIʻI

---oOo---

STATE OF HAWAIʻI, Plaintiff, v.
SCOTT T. NAGO, Chief Election Officer,
State of Hawaiʻi, Defendant

NO. CAOT-20-0000528

SEPTEMBER 3, 2020

LEONARD, PRESIDING JUDGE, AND CHAN, J., WITH
HIRAOKA, J., CONCURRING AND DISSENTING IN PART

OPINION AND ORDER OF THE COURT BY LEONARD, J.

On August 26, 2020, Plaintiff State of Hawaiʻi (**State**), by and through its Attorney General Clare E. Connors (**AG**), filed a Complaint for Injunctive Relief (**Complaint**), naming the State's Chief Election Officer Scott T. Nago (**Nago**) as Defendant. The Complaint includes an Agreed Upon Statement of Facts, Issues, and Reasons in Support, and is accompanied by a Declaration by Nago.

The Complaint concerns a special election to fill a vacant seat in the Hawai'i Senate. The parties agree that if candidates are nominated, or file nomination papers, up until the latest possible date contemplated under the applicable statute, which is September 24, 2020, then the Office of Elections will not have sufficient time to provide ballots to uniformed service members and other overseas voters. The parties further agree that the candidate filing deadline for this Senate seat should be advanced to September 5, 2020, to provide sufficient time for the Office of Elections to provide ballots to uniformed service members and other overseas voters in compliance with state and federal statutory mandates. The parties do not agree on the proper method to advance the candidate filing deadline and ask this court to determine, on an expedited basis:

1.    Whether Hawaii Revised Statutes (**HRS**) § 17-3(b)(3) (2009) and HRS Chapter 15D (Supp. 2019) confer discretion on Nago to advance the candidate filing deadline for the subject special election from September 24, 2020, to September 5, 2020; and

2.    If Nago does not have the discretion to advance the candidate filing deadline, whether the AG may obtain injunctive or other equitable relief pursuant to HRS § 15D-17,[1] which will effectively advance the candidate filing deadline for

---

[1]    Although the Complaint principally states that it seeks injunctive relief, other equitable remedies are sought as well.

the subject special election from September 24, 2020, to September 5, 2020.

For the reasons set forth below, we hold that Nago does not have the discretion to unilaterally advance a candidate filing deadline, but that construing the applicable statutes with reference to each other, there is an alternative means to ensure substantial compliance with HRS Chapter 15D, the Uniform Military and Overseas Voters Act. We deny the AG's request for injunctive relief, but grant other equitable relief including a declaration that the subject statutes must be construed with reference to each other and in a manner to ensure that ballots and balloting materials for the City and County of Honolulu, including for the special election to fill the vacant Senate seat, are transmitted no later than September 18, 2020, and instructions to Nago to accept the nomination of party candidates and the nomination papers of nonpartisan candidates for the special election for the Sixteenth District of the Hawai'i State Senate not later than 4:30 p.m., on Saturday, September 5, 2020.

I.   JURISDICTION

HRS § 602-57(2) (2016) confers jurisdiction upon the Hawai'i Intermediate Court of Appeals (**ICA**) over an original civil action that is submitted on agreed facts:

> **§ 602-57 Jurisdiction.** Notwithstanding any other law to the contrary, the intermediate appellate court shall have jurisdiction, subject to transfer as provided in section 602-58 or review on application for a writ of certiorari as provided in section 602-59:
> . . . .

3

> (2)  To entertain, in its discretion, any case
> submitted without suit when there is a question
> of law that could be the subject of a civil
> action or proceeding in the circuit court, or
> tax appeal court, and the parties agree upon the
> facts upon which the controversy depends[.]

Hawai'i Rules of Appellate Procedure (**HRAP**) Rule 18

further provides:

> **Rule 18. Agreed Facts; Submission On.**
> (a) **Submission.**  As authorized by law, the parties to
> a dispute that might be the subject of a civil action or
> proceeding in any court or agency may, without the action of
> a trial court or agency, agree to submit a case directly to
> the intermediate court of appeals upon a statement
> containing the facts upon which the controversy depends, a
> statement of the question or issues, the contentions of the
> parties as to each issue, and the form of judgment that each
> party requests the intermediate court of appeals to render.
> (b) **Good Faith.**  It must be shown by affidavit or
> declaration that the controversy is real and that the
> proceedings are a good faith effort to determine the rights
> of the parties.
> (c) **Disposition.**  The appellate court may refuse to
> entertain a case submitted on agreed facts.  If the
> appellate court entertains the case, the judgment rendered
> thereon shall be entered and may be enforced as in other
> cases, subject to the right of a party to move for
> reconsideration or, if the case is decided in the
> intermediate court of appeals, apply for a writ of
> certiorari.

This case, submitted to the ICA upon agreed facts,

falls within the parameters of HRS § 602-57(2) and HRAP Rule 18.

We hereby exercise our discretion to entertain this case and

render a decision based upon the facts agreed to by the parties.

II.  AGREED UPON FACTS[2]

On June 18, 2020, the Honorable Breene Harimoto

(**Senator Harimoto**), the Hawai'i State Senator for District 16,

---

[2]  The parties submitted additional agreed facts, as well as their respective formulations of the issues and the reasons and authorities in support of their positions, in conjunction with the Agreed Upon Statement of Facts filed with the Complaint.  Pursuant to this court's August 27, 2020 Order, on August 28, 2020, the parties filed a Supplemental Statement of Agreed Upon Facts.

passed away.[3] Had he not died, Senator Harimoto's term would have ended on November 8, 2022. The parties agree that, pursuant to Hawaiʻi law, a special election to fill the vacancy left by Senator Harimoto's death must be held at the upcoming November 3, 2020 general election (**General Election**).

The parties agree, and Nago avers, as follows. The Office of Elections is responsible for printing paper ballots and generating HTML ballots, which are included in the ballot packages transmitted to voters by their respective counties. Based on the programming used to generate the ballots, the ballots are finalized on a countywide basis and cannot be finalized by district. The City and County of Honolulu's ballots cannot be finalized until the list of Senate District 16 candidates is finalized. Once the list of candidates is finalized, the Office of Elections needs a minimum of twelve days to generate, proof, print, and deliver paper ballots and HTML ballots to the City and County of Honolulu. There are approximately 478,926 active registered voters in the City and County of Honolulu.

On August 26, 2020, Nago issued a Proclamation stating that a special election will be held on November 3, 2020, to fill the vacant seat caused by the death of Senator Harimoto. The Proclamation provides that party candidates shall be nominated by

---

[3] We note in passing that prior to Senator Harimoto, the current governor of Hawaiʻi, the Honorable David Ige, represented this district from November of 1994, to the time he was elected as governor.

the county committees of the parties and submitted to the Office of Elections no later than 4:30 p.m. on Saturday, September 5, 2020. Nonpartisan candidates are to file their nomination papers within the same time frame. The Proclamation states that the Office of Elections will be open on Saturday, September 5, 2020. The parties point out that, unlike the typical nomination paper process in regularly-scheduled elections, no signatures are required on the nomination papers to be submitted by candidates wishing to run in this special election.[4]

On August 26, 2020, the Proclamation was posted on the homepage of the Office of Elections' website and submitted to the Garden Island, The Maui News, Hawaii Tribune-Herald, West Hawaii Today, and Honolulu Star-Advertiser for publication. The publication dates for the Proclamation were August 29, 2020, for The Maui News, and August 30, 2020, for all other publications. Copies of the Proclamation were emailed to each of the qualified political parties, and a call was also placed to each political party.

III. DISCUSSION

HRS § 17-3 (2009) provides various mandates for the filling of a vacancy in the Hawai'i Senate.[5] Applicable to this

---

[4] HRS § 12-5(d) (2009) provides: "No signatures shall be required on nomination papers for candidates filing to run in a special primary or special election to fill a vacancy."

[5] HRS § 17-3(a) concerns any vacancy, the term of which ends at the next succeeding general election. HRS § 17-3(b) concerns any vacancy, the term of which does not end at the next succeeding general election. As
(continued...)

case, HRS § 17-3(b)(3) provides, in relevant part:

> (3)    If [a vacancy] occurs after the sixtieth day prior to the next succeeding primary but not later than on the fiftieth day prior to the next succeeding general election, or if there are no qualified candidates for any party or nonpartisan candidates in the primary, the vacancy shall be filled for the unexpired term at the next succeeding general election. The chief election officer shall issue a proclamation designating the election for filling the vacancy. <u>Party candidates for the unexpired senate term shall be nominated by the county committees of the parties **not later than** 4:30 p.m. on the fortieth day prior to the general election; nonpartisan candidates may file nomination papers for the unexpired term **not later than** 4:30 p.m. on the fortieth day prior to the general election</u> with the nonpartisan candidate who is to be nominated to be decided by lot, under the supervision of the chief election officer. The candidates for the unexpired term shall be elected in accordance with this title. Pending the election, the governor shall make a temporary appointment to fill the vacancy, and the person appointed shall serve until the election of the person duly elected to fill the vacancy.

(Emphasis added).

Thus, pursuant to HRS § 17-3(b)(3), candidates for the vacant Senate seat must be nominated or file nomination papers <u>not later than</u> 4:30 p.m. on the fortieth day prior to the General Election, which the parties agree is September 24, 2020. The parties also agree that Nago is the State official that is responsible for implementing HRS § 17-3(b)(3).

The parties further agree that, pursuant to HRS § 15D-4 (Supp. 2019),[6] Nago is also responsible for implementing HRS

---

[5](...continued)
Senator Harimoto's term did not end at the next succeeding general election, HRS § 17-3(b) applies here.

[6]    HRS § 15D-4 provides:

> **§ 15D-4 Role of chief election officer.** (a) The chief election officer shall be the state official
>
> (continued...)

Chapter 15D, the Uniform Military and Overseas Voters Act, as well as its federal counterpart, 42 U.S.C. § 1973ff,[7] the Uniformed and Overseas Citizens Absentee Voting Act. The Uniform Military and Overseas Voters Act was passed by the Hawai'i Legislature in 2012. A Senate Standing Committee report explains its purpose:

> The federal Uniformed and Overseas Citizens Absentee Voting Act of 1986 and the Military and Overseas Voter Empowerment Act of 2009 have not been wholly effective in overcoming the difficulties overseas voters face. Furthermore, these federal laws do not apply to state or

---

[6](...continued)
> responsible for implementing this chapter and the State's responsibilities under the Uniformed and Overseas Citizens Absentee Voting Act, 42 U.S.C. section 1973ff et seq.
>      (b)  The chief election officer shall establish an electronic transmission system through which a covered voter may apply for and receive voter registration materials, military-overseas ballots, and other information under this chapter. The chief election officer may satisfy the requirements of this chapter by utilizing an electronic transmission system established by the Federal Voting Assistance Program in lieu of creating a separate electronic transmission system.
>      (c)  The chief election officer shall develop standardized absentee-voting materials, including privacy and transmission envelopes and their electronic equivalents, authentication materials, and voting instructions, to be used with the military-overseas ballot of a voter authorized to vote in any jurisdiction in this State.
>      (d)  The chief election officer shall accept forms prescribed by the Uniformed and Overseas Citizens Absentee Voting Act, 42 U.S.C. section 1973ff et seq., for use by a covered voter [that] contains the prescribed standard declaration to swear or affirm specific representations pertaining to the voter's identity, eligibility to vote, status as a covered voter, and timely and proper completion of an overseas-military ballot.

[7]      42 U.S.C. § 1973ff has been editorially reclassified and transferred to 52 U.S.C. § 20302. Previously, in 2009, Congress passed the Military and Overseas Voter Empowerment Act, which amended the Uniformed and Overseas Citizens Absentee Voting Act of 1986, 42 U.S.C. § 1973ff, *et seq.* Pub. L. No. 111-84, §§ 577 to 582, 583(a), 584 to 587, 123 Stat. 2190 (2009). In particular, states are now required by 52 U.S.C. § 20302 to "transmit a validly requested absentee ballot to an absent uniformed services voter or overseas voter . . . not later than 45 days before the election" so long as the absentee ballot request was received at least 45 days before the election.

local elections, which results in states conducting elections under procedures that vary dramatically from state to state. The lack of uniformity between jurisdictions and the non-applicability of federal law complicate efforts to engage voters and represents a major impediment to the ability of military personnel and overseas civilians to vote.

By adopting the Uniform Military and Overseas Voters Act, this measure addresses these issues by extending the assistance and protections for military and overseas voters under existing federal law to state elections. This measure also uniformly applies the military and overseas voting process to all covered elections of which the State has primary administrative responsibility.

S. Stand. Comm. Rep. No. 2450, in 2012 Senate Journal, at 1020.

In short, HRS Chapter 15D was intended to provide assistance to and protections for uniformed military and other overseas voters, by implementing deadlines and procedures to ensure that these voters are not disenfranchised. The Uniform Military and Overseas Voters Act applies to general, special, or primary elections for state office, as well as, *inter alia*, to general, special, or primary elections for federal office. HRS § 15D-3 (Supp. 2019). HRS § 15D-9(a) (Supp. 2019) provides:

> **§ 15D-9 Transmission of unvoted ballots.** (a) <u>No later than forty-five days before the election or</u>, if the forty-fifth day before the election is a weekend or holiday, <u>no later than the business day preceding the forty-fifth day</u>, the election official in each jurisdiction charged with distributing a ballot and balloting materials shall transmit a ballot and balloting materials to all covered voters who by that date submit a valid military-overseas ballot application.

The parties agree that, pursuant to HRS § 15D-9(a), the ballots and balloting materials must be transmitted no later than September 18, 2020.[8] As the parties further agree, if the

---

[8] The parties also agree that under the federal Military and Overseas Voter Empowerment Act, ballots must be mailed no later than September 19, 2020.

candidates' filing deadline remains as September 24, 2020, then the Office of Elections will not be able to meet the ballot mailing deadline in HRS § 15D-9(a) or the corresponding deadline under federal law.

Nago contends that because the Uniform Military and Overseas Voters Act, including HRS § 15D-9, was enacted after HRS § 17-3(b)(3), HRS § 15D-9 supersedes any conflicting provisions of HRS § 17-3(b)(3). He cites no authority for this proposition, but relies on the logic that the Legislature must have been aware of the existing statutory deadlines when it imposed the new ones. Nago further contends that, given his statutory responsibility to implement both HRS § 17-3(b)(3) and HRS § 15D-9, he has the discretion to harmonize the statutes. He submits that it is a reasonable exercise of his discretion to advance the candidate filing deadline for the Senate District 16 vacancy from the latest possible day permitted under HRS § 17-3(b)(3) to September 5, 2020, in order to allow the Office of Elections sufficient time to prepare and furnish the ballots to the City and County of Honolulu, thereby complying with the state and federal laws enacted to assist overseas and military voters and to protect their voting rights.

The AG argues that for the candidate filing deadline to be advanced, the AG must make an application to a court and obtain injunctive or other equitable relief. Implicit in this argument is the AG's disagreement with Nago's contention that the

statutory scheme grants Nago the discretion to unilaterally advance the candidate filing deadline. The AG further argues that, under well-established principles of statutory construction, where there is a plainly irreconcilable conflict between a general and a specific statute concerning the same subject matter, the specific statute governs. The AG then submits that the no-later-than-40-days-prior-to-the-election deadline in HRS § 17-3(b)(3) is more specific than the no-later-than-45-days-before-the-election deadline in HRS § 15D-9 and, therefore, HRS § 17-3(b)(3) governs. The AG offers no explanation as to why we should construe the former as more specific than the latter; this argument is not persuasive.

The AG further argues that HRS § 15D-17 (Supp. 2019) authorizes her to bring this action for injunctive or other equitable relief in order to ensure compliance with the Uniform Military and Overseas Voters Act deadline. HRS § 15D-17 provides:

> **§ 15D-17 Equitable relief.** A court may issue an injunction or grant other equitable relief appropriate to ensure substantial compliance with or enforce this chapter on application by:
> (1)   A covered voter alleging a grievance under this chapter; or
> (2)   The attorney general of the State.
> No award of attorney fees or costs shall be permitted in any private cause of action initiated under this chapter.

We begin with Nago's contention that, in light of the apparently conflicting statutory scheme and his statutory responsibilities, the Legislature must have intended to give him the discretion to harmonize the statutes, as needed, and to

11

advance the candidate filing deadline in this instance. While we recognize Nago's supervisory authority and many interrelated responsibilities pursuant to, *inter alia*, HRS Chapters 11 (Elections, Generally) (2009 & Supp. 2019), 15 (Absentee Voting) (2009 & Supp. 2019), 15D (Uniform Military and Overseas Voters Act), 16 (Voting Systems) (2009 & Supp. 2019), and 17 (Vacancies) (2009 & Supp. 2019), Nago fails to point to any statutory provision expressly or implicitly granting him such discretion. It may well be that, pursuant to HRS § 11-4 (Supp. 2019)[9] and in accordance with HRS Chapter 91 (Hawaii Administrative Procedures Act), Nago may adopt administrative rules to this effect, but Nago points to no such rules, and after reviewing Hawai'i Administrative Rules Chapter 3-177 (Rules of the Office of Elections) (effective July 26, 2020), we find none. See generally Green Party of Haw. v. Nago, 138 Hawai'i 228, 378 P.3d 944 (2016) (discussing rulemaking requirements and the Office of Elections). Accordingly, we cannot conclude that Nago has the discretion to unilaterally advance the candidate filing deadline for the subject special election from September 24, 2020, to September 5, 2020.

---

[9]     HRS § 11-4 provides:

> **§ 11-4  Rules.** The chief election officer may make, amend, and repeal rules governing elections held under this title, election procedures, and the selection, establishment, use, and operation of all voting systems now in use or to be adopted in the State, and all other similar matters relating thereto as in the chief election officer's judgment shall be necessary to carry out this title.

This case nevertheless requires further interpretation of HRS §§ 17-3(b)(3), 15D-9(a), and 15D-17.

> The fundamental starting point for statutory interpretation is the language of the statute itself. Where the statutory language is plain and unambiguous, this court's sole duty is to give effect to the statute's plain and obvious meaning, which is obtained primarily from the language contained in the statute itself.

Waters v. Nago, 148 Hawaiʻi 46, __, 468 P.3d 60, 75 (2019) (citation omitted). It has long been held that particular statutory language must be read in the context of the entire statutory scheme and must be construed consistent with the purpose of the statute or statutes. See id.; see also Halstead v. Pratt, 14 Haw. 38, 39 (1902) ("The general rule is that a statute should be construed with reference to the system of laws of which it is a part, unless a contrary intention clearly appears. If this were not so, statutes would often have to be given absurd constructions, for they often do not contain express provisions as to the extent of their operation in this respect.").

The Hawaiʻi Legislature has enacted provisions governing statutory construction, as well, including:

> **§ 1-14 Words have usual meaning.** The words of a law are generally to be understood in their most known and usual signification, without attending so much as to the literal and strictly grammatical construction of the words to their general or popular use or meaning.

HRS § 1-14 (2009).

> **§ 1-15 Construction of ambiguous context.** Where the words of a law are ambiguous:
>
> (1) The meaning of the ambiguous words may be sought by examining the context, with which the

> ambiguous words, phrases, and sentences may be compared, in order to ascertain their true meaning.
>
> (2) The reason and spirit of the law, and the cause which induced the legislature to enact it, may be considered to discover its true meaning.
>
> (3) Every construction which leads to an absurdity shall be rejected.

HRS § 1-15 (2009).

> § 1-16 **Laws in pari materia.** Laws in pari materia, or upon the same subject matter, shall be construed with reference to each other. What is clear in one statute may be called in aid to explain what is doubtful in another.

HRS § 1-16 (2009).

HRS §§ 17-3(b)(3) states that party candidates shall be nominated by their parties <u>not later than</u> 4:30 p.m. on the fortieth day prior to the general election and nonpartisan candidates may file nomination papers <u>not later than</u> 4:30 p.m. on the fortieth day prior to the general election.[10] The statute is unambiguous in its clear prohibition against a later party nomination or a later filing of nomination papers, but it does not expressly prohibit an earlier deadline. See Waters, 148 Hawai'i at __, 468 P.3d at 78-79 (holding that a similar "not later than" provision prohibited the consideration and counting of ballots that were not received by the City Clerk or a designated representative prior to the "not later than" date and

---

[10] We note that HRS § 17-3(b)(3) uses the word "shall" with respect to party candidates and "may" with respect to nonpartisan candidates. Courts have frequently struggled with the legislative use of the terms "may" and "shall" in close proximity. See, e.g., Gray v. Admin. Dir. of the Court, 84 Hawai'i 138, 149-50, 931 P.2d 580, 591-92 (1997). However, here, it seems clear that the distinction refers to who submits the nomination. Party candidates "shall" or must be nominated only by the party – in other words, a party candidate cannot simply file nomination papers on his or her own – whereas a nonpartisan candidate "may" file nomination papers on his or her own behalf.

time). HRS § 17-3(b)(3) does not, for example, mandate that the candidates have "until" the fortieth day prior to the general election or otherwise foreclose an earlier deadline.

HRS § 15D-9(a) similarly states that ballots and balloting materials shall be transmitted not later than forty-five days before the election (or the preceding business day, if a weekend or holiday). This statute is equally unambiguous in its clear prohibition against a later transmission of ballots and balloting materials to the subject voters. See Waters, 148 Hawai'i at __, 468 P.3d at 78-79. As set forth above, the Uniform Military and Overseas Voters Act was enacted in 2012 for the specific and express purpose of providing assistance to and protections for uniformed military and other overseas voters, by implementing deadlines and procedures to ensure that these voters are not disenfranchised. The not-later-than deadline in HRS § 15D-9(a) is clearly a linchpin in this statutory scheme.

Perhaps ironically, years earlier, in Act 35 of 1990, the Hawai'i Legislature amended the not-later-than date in HRS § 17-3(b)(3) from thirty days prior to the election to forty days prior to the election for the express purpose of complying with federal recommendations for the mailing of absentee ballots, providing statutory consistency for state election laws, and providing election officials with sufficient time to comply with federal guidelines. See H. Stand. Comm. Rep. No. 542-90, in 1990 House Journal, at 1044; S. Stand. Comm. Rep. No. 2939, in 1990

Senate Journal, at 1202. However, Congress later amended the corresponding federal law to require states to transmit ballots not later than forty-five days before the election. See 52 U.S.C. § 20302.[11]

The Hawai'i Legislature's clear intent in enacting the Uniform Military and Overseas Voters Act in 2012 was to extend the federal protections for the covered voters to Hawai'i state elections.

Thus, notwithstanding any ambiguity in these statutes, the overarching "reason and spirit of the law, and the cause which induced the legislature to enact" them lead us to conclude that HRS § 17-3(b)(3) must be interpreted in a manner that gives full effect to the Legislature's intent in enacting HRS § 15D-9(a). See HRS §§ 1-15 & 1-16; cf., e.g., State v. Keawe, 107 Hawai'i 1, 5-6, 108 P.3d 304, 308-09 (2005) (interpreting HRS § 803-5 to include a temporal requirement in order to give full effect to the Legislature's intent in enacting HRS § 803-1 and related provisions). We further conclude that the transmission of ballots and balloting materials for the City and County of Honolulu without a complete list of candidates for the special election to fill Senator Harimoto's unexpired term would lead to an absurdity because it would undermine the Legislature's intent

---

[11] Chapter 203 of Title 52 of the U.S.C. is entitled Registration and Voting by Absent Uniformed Services Voters and Overseas Voters in Elections for Federal Office. As noted above, 52 U.S.C. § 20302 was formerly cited as 42 U.S.C. § 1973ff.

in enacting HRS § 15D-9(a) and potentially disenfranchise persons entitled to vote in the special election for Senate District 16.

While, admittedly, a further amendment to HRS § 17-3(b)(3) might have provided even greater clarity,[12] the Legislature did in fact enact HRS § 15D-17 to expressly authorize a court to issue an injunction or grant other equitable relief appropriate to ensure substantial compliance with or to enforce the mandates in HRS Chapter 15D, in this case, HRS § 15D-9(a). As authorized by the Legislature in HRS § 15D-17, the AG has petitioned this court for relief in order to ensure substantial compliance with or to enforce HRS § 15D-9(a).

IV.   CONCLUSION

Accordingly, we turn to the parties' requests for relief.  For the reasons stated above, we decline Nago's request that this court declare that he has the discretion to advance the candidate filing deadline for the special election to fill Senator Harimoto's unexpired term from September 24, 2020, to September 5, 2020.  We also decline the AG's request that this court enjoin Nago from enforcing a September 24, 2020 candidate filing deadline for the special election to fill Senator Harimoto's unexpired term.  Because Nago has officially proclaimed his intent to accept party nominations and nonpartisan candidate nomination papers at no time later than 4:30 p.m. on

---

[12]     The parties note unsuccessful legislative attempts to amend HRS § 17-3(b)(3) in 2018 and 2020.

Saturday, September 5, 2020, absent an adverse ruling by this court, the requested injunctive relief is unnecessary.[13]

Now, therefore, pursuant to the authority provided in HRS § 15D-17 to grant equitable relief appropriate to ensure substantial compliance with or to enforce HRS Chapter 15D, we HEREBY ORDER THE FOLLOWING EQUITABLE RELIEF:

(1) We declare that HRS § 17-3(b)(3) and HRS § 15D-9(a) must be construed with reference to each other and in a manner to ensure that ballots and balloting materials for the City and County of Honolulu, including for the special election to fill Senator Harimoto's unexpired term, are transmitted no later than September 18, 2020; and

(2) In order to meet the September 18, 2020 deadline, we instruct Nago to accept the nomination of party candidates and the nomination papers of nonpartisan candidates for the special election for the Sixteenth District of the Hawai'i State Senate not later than 4:30 p.m., on Saturday, September 5, 2020, as set forth in Nago's August 25, 2020 Proclamation; no further

_____

[13] In other words, in light of Nago's Proclamation and the Opinion and Order of this court, the irreparable harm that the AG seeks to prevent, which would arise out of a September 24, 2020 candidate filing deadline, will not occur. See Office of Hawaiian Affairs v. Hous. & Cmty. Dev. Corp. of Haw., 117 Hawai'i 174, 211-12, 177 P.3d 884, 921-22 (2008), rev'd on other grounds, Hawai'i v. Office of Hawaiian Affairs, 556 U.S. 163 (2009) (stating the requirements for injunctive relief).

proclamation is necessary to be consistent with the Opinion and

Order of this court.


Patricia Ohara,
Robyn B. Chun,
Deputy Attorneys General,
Department of the Attorney
 General,
for Plaintiff.

Lori N. Tanigawa,
Deputy Attorney General,
Department of the Attorney
 General,
for Defendant.

/s/ Katherine G. Leonard
Presiding Judge

/s/ Derrick H.M. Chan
Associate Judge

**OPINION BY HIRAOKA, J.,**
**CONCURRING IN PART AND DISSENTING IN PART**

Respectfully, I dissent in part.  I concur that Nago[1] does not have discretion to unilaterally advance the filing dates[2] prescribed by HRS § 17-3(b)(3).  I also concur that under HRS § 15D-17, the ICA may grant the AG's request for equitable relief to clarify <u>directory</u> language in the election statute, in this case concerning deadlines for political parties.

In my view, however, absent a constitutional challenge[3] we have no authority under HRS § 15D-17 to grant equitable relief contrary to the plain and unambiguous <u>mandatory</u> language of HRS § 17-3(b)(3).  I would hold that HRS § 17-3(b)(3) mandates that nonpartisan candidates be allowed to file nomination papers for the Senate District 16 special election until September 24, 2020, and that the AG is not correct that such a ruling would result in irreparable damage.

**Separation of Powers**
**and Judicial Restraint**

The structure of government in Hawai'i "is one in which the sovereign power is divided and allocated among three co-equal branches."  <u>Tax Found. of Hawai'i v. State</u>, 144 Hawai'i 175, 190, 439 P.3d 127, 142 (2019) (citation omitted).  The power to determine public policy and enact laws reflecting it lies with the legislative branch.  <u>Peer News LLC v. City & Cty. of Honolulu</u>, 143 Hawai'i 472, 489, 431 P.3d 1245, 1262 (2018).  The executive branch — of which the Office of Elections and the Chief Election Officer are part — is charged to administer and enforce those

---

[1]     I use the terms defined by the majority opinion.

[2]     I use the plural "dates" because the statute sets separate dates for political party nominations and for nonpartisan filers; the dates happen to both fall on the "fortieth day prior to the general election."

[3]     Neither party challenges the constitutionality of any of the statutes at issue in this case.

laws. Haw. Const. art. V, § 5. In reviewing actions of the executive branch:

> The court does not have the function of determining what should be done, or the latitude to substitute its appraisals and conclusions for those of the executive branch. The function of the court . . . is to consider whether there is a showing that proposed executive action is contrary to law or an abuse of discretion.

Life of the Land v. Ariyoshi, 59 Haw. 156, 165, 577 P.2d 1116, 1122 (1978) (cleaned up).

It is "the province and duty of the judicial department to say what the law is." HawaiiUSA Fed. Credit Union v. Monalim, 147 Hawai'i 33, 49, 464 P.3d 821, 837 (2020) (quoting Marbury v. Madison, 5 U.S. 137, 177 (1803)). But in so doing, courts are constrained by principles of statutory construction. That is because "[n]either the courts nor the administrative agencies are empowered to rewrite statutes to suit their notions of sound public policy where the legislature has clearly and unambiguously spoken." Asato v. Procurement Policy Bd., 132 Hawai'i 333, 350, 322 P.3d 228, 245 (2014) (citation omitted).

"When construing a statute, our foremost obligation is to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself." State v. Abella, 145 Hawai'i 541, 552, 454 P.3d 482, 493 (2019) (cleaned up) (citation omitted). "Where the statutory language is plain and unambiguous, [a] court's sole duty is to give effect to its plain and obvious meaning." Peer News LLC v. City & Cty. of Honolulu, 138 Hawai'i 53, 60, 376 P.3d 1, 8 (2016). Of particular significance for this case, the Hawai'i Supreme Court has stated:

> *We cannot change the language of the statute . . . in order to make it suit a certain state of facts.* We do not legislate or make laws. Even where the Court is convinced in its own mind that the Legislature really meant and intended something not expressed by the phraseology of the Act, *it has no authority to depart from the plain meaning of the language used.*

State v. Demello, 136 Hawaiʻi 193, 197, 361 P.3d 420, 424 (2015) (emphasis added) (citation omitted).

### Statutory Analysis

Under HRS § 15D-9, the State must transmit ballots for federal, state, and local elections to certain military personnel, spouses, and dependents, and to registered voters living outside the United States, "[n]o later than forty-five days before the election or, if the forty-fifth day . . . is a weekend or holiday, no later than the business day preceding the forty-fifth day[.]" For the special election to fill the vacancy in State Senate District 16 (**Special Election**), that date is Friday, September 18, 2020 (**Mailing Date**).

Under HRS § 17-3(b)(3):

> Party candidates for the unexpired senate term <u>shall</u> be nominated by the county committees of the parties not later than 4:30 p.m. on the fortieth day prior to the general election; nonpartisan candidates <u>may</u> file nomination papers for the unexpired term not later than 4:30 p.m. on the fortieth day prior to the general election[.]

(Underscoring added.) The 40th day before the Special Election is September 24, 2020 (**Filing Date**).

The Mailing Date is 6 days before the Filing Date. According to the parties, Hawaiʻi election ballots are prepared on a county-wide basis. The State requires a minimum of 12 days to generate, proof, print, and deliver ballot packages[4] to the county clerks for mailing. To meet the Mailing Date, given the 12-day lead time, the State must begin preparing ballots by September 6, 2020. That is why Nago issued the Proclamation, which advanced the filing deadline for party nominees and nonpartisan candidates to September 5, 2020.

---

[4] Ballot packages for elections by mail include: (1) an official ballot; (2) a return identification envelope with postage prepaid; (3) a secrecy envelope or secrecy sleeve; and (4) instructions. HRS § 11-102(a) (Supp. 2019).

-3-

The Hawai'i Supreme Court has held:

> [T]his court has subscribed to the proposition that, where the verbs "shall" and "may" are used in the same statute, especially where they are used in close juxtaposition, we infer that the legislature realized the difference in meaning and intended that the verbs used should carry with them their ordinary meanings. Not surprisingly, we have therefore construed the close proximity of the contrasting verbs "may" and "shall" to require a <u>mandatory</u> effect for the term "shall." . . . [T]he converse would seem to follow, namely, that the close proximity of the contrasting verbs "may" and "shall" requires a <u>non-mandatory</u>, <u>i.e.</u>, a discretionary, construction of the term "may."

<u>Gray v. Admin. Dir. of the Court</u>, 84 Hawai'i 138, 149, 931 P.2d 580, 591 (1997) (cleaned up). In HRS § 17-3(b)(3), the subject of the mandatory verb "shall" is "the county committees of the [political] parties[.]" The statute mandates that parties "shall" nominate their candidates "not later than" the Filing Date but, as noted by the majority, "it does not expressly prohibit an earlier deadline" for political parties. September 5, 2020, is "not later than" September 24, 2020. I agree that Nago advancing the filing date — for <u>political party</u> <u>nominations</u> — to harmonize the conflict between sections 17-3(b)(3) and 15D-9 was not contrary to law.

However, in HRS § 17-3(b)(3) the subject of the permissive verb "may" is "nonpartisan candidates." The statute permits — <u>i.e.</u>, gives a right to — nonpartisan candidates to file nomination papers until the Filing Date.[5] The majority correctly observes that the statute does not "mandate that the candidates have 'until' the fortieth day prior to the general election." In my view, the legislature's use of the words "may file . . . not later than" the stated time and date is the functional equivalent of the stating that nonpartisan candidates have "until" that time and date to file. I would hold that advancing the filing date

---

[5] If more than one nonpartisan candidate files nomination papers before the Filing Date, the nonpartisan candidate whose name will appear on the Special Election ballot is to be decided by lot, under the supervision of the State's Chief Election Officer. HRS § 17-3(b)(3).

could deprive a nonpartisan candidate of a right granted by the plain language of the statute, and is therefore beyond our authority to declare lawful under HRS § 15D-17.

### Injunctive Relief

The AG seeks an injunction prohibiting Nago from enforcing the September 24, 2020 Filing Date, and mandating a filing date of September 5, 2020. The AG contends that if the State cannot know who all of the Special Election candidates will be until the Filing Date, the State will have to mail ballot packages that might not list all qualified candidates for the Special Election.

The test for granting or denying injunctive relief has three parts:

> (1) whether the plaintiff is likely to prevail on the merits; (2) whether the balance of irreparable damage favors the issuance of a temporary injunction; and (3) whether the public interest supports granting an injunction. . . . [T]he more the balance of irreparable damage favors issuance of the injunction, the less the party seeking the injunction has to show the likelihood of . . . success on the merits.

Office of Hawaiian Affairs v. Hous. & Cmty. Dev. Corp. of Hawai'i, 117 Hawai'i 174, 211-12, 177 P.3d 884, 921-22 (2008), rev'd on other grounds, Hawaii v. Office of Hawaiian Affairs, 556 U.S. 163 (2009) (cleaned up) (citation omitted). I would deny the injunctive relief requested as to a nonpartisan candidate.

1.  The State is not likely to prevail on the merits against nonpartisan candidates.

As discussed above, I would hold that the Filing Date cannot legally be advanced for any nonpartisan candidates.

2.    The State has not
      shown irreparable damage.

If the State complies with the Mailing Date, and if an otherwise qualified nonpartisan candidate files nomination papers after the Special Election ballots are prepared, but before the Filing Date, the Special Election result could be subject to challenge.[6] Were that to happen, the potential remedy is prescribed by HRS § 11-174.5 (2009). That statute provides, in relevant part:

> If the judgment [of the supreme court] should be that the . . . special . . . election was invalid, a certified copy thereof shall be filed with the governor, and the governor shall duly call a new election to be held not later than one hundred twenty days after the judgment is filed.

See Waters v. Nago, 148 Hawaiʻi 46, 468 P.3d 60 (2019) (invalidating special election decided by 22-vote margin where 350 ballots received by city clerk after poll closure were commingled with timely ballots, so that recount excluding invalid votes was not possible).

Barring any other irregularities, no other state, or any federal or local, election result would be subject to challenge. In my opinion, with respect to nonpartisan candidates for the Special Election, a plain reading of the statutes at issue requires compliance with each. The possible consequence is that the Special Election could be held invalid, in which case a new special election for Senate District 16 only must be held; ballots for the new special election would have to be provided to military personnel, spouses, and dependents, and to registered voters living outside the United States, who are registered to

---

[6]    Should that situation arise, the Office of Elections may wish to delay reporting the Senate District 16 election result until after any challenge to the Special Election is decided, in the event a new special election for that district is required. See City & Cty. of Honolulu v. State, 143 Hawaiʻi 455, 464, 431 P.3d 1228, 1237 (2018) (noting that "settling such challenges before the votes are tallied protects the integrity of our most sacred democratic institutions.").

vote in Senate District 16 as required by HRS § 15D-9. In my view, the potential damage caused by the conflicting statutes would be inefficient and wasteful, but not irreparable.

3.   The public interest does not
     support the requested injunction.

The AG recognizes that "advancing the . . . Filing [Date from September 24, 2020, to September 5, 2020, will] require[] that . . . prospective nonpartisan candidates decide whether to run for this office 20 days earlier than antici-pated[.]" Based upon the plain language of HRS § 17-3(b)(3) mandating that nonpartisan candidates for special election be given until "not later than 4:30 p.m. on the fortieth day prior to the general election[,]" I would hold that the injunction requested by the AG is contrary to the public interest stated by the legislature.

## CONCLUSION

For the foregoing reasons, I would hold: **(1)** HRS § 15D-9 requires that blank Special Election ballots be trans-mitted to certain military personnel, spouses, and dependents, and to registered voters living outside the United States, "no later than" September 18, 2020; **(2)** the plain language of HRS § 17-3(b)(3) requires that a nonpartisan candidate "may" file nomination papers for the Special Election "not later than 4:30 p.m. on" September 24, 2020; and **(3)** if an otherwise qualified nonpartisan candidate filed nomination papers for the Special Election after ballots are finalized but before the September 24, 2020 Filing Date, the Special Election result could be subject to challenge; were that to happen, the damage would not be irreparable because the potential remedy is prescribed by HRS § 11-174.5. I acknowledge that would be wasteful and inefficient to effectuate, but it is the result I believe the law

requires absent an amendment to one or more of the statutes by the legislature.

/s/ Keith K. Hiraoka
Associate Judge